IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of<br>ERIK HANSON<br><br>STATE OF WASHINGTON,<br><br>     Respondent,<br><br>   v.<br><br>ERIK HANSON,<br><br>     Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 70139-8-I<br><br>DIVISION ONE<br><br><br>UNPUBLISHED OPINION<br><br><br><br>FILED: February 9, 2015 |

SCHINDLER, J. — Erik Hanson appeals his civil commitment as a sexually violent predator under chapter 71.09 RCW. Hanson argues the trial court erred by (1) denying his motion for a mistrial, (2) denying his right to present a defense by refusing to treat a fact witness as an expert, (3) denying his request for a Frye[1] hearing, and (4) limiting the scope of questioning potential jurors during voir dire. We affirm.

FACTS

Erik Hanson was convicted in juvenile court in 1987 of first degree incest and indecent liberties. In 1989, Hanson pleaded guilty in juvenile court to first degree child molestation.

---

[1] Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923).

In 1999, Hanson pleaded guilty to attempted second degree rape and was sentenced to 120 months in prison. In January 2009, the State filed a petition to involuntarily commit Hanson as a sexually violent predator under chapter 71.09 RCW.

Licensed psychologist Dr. Christopher North evaluated Hanson in September 2005 and again in December 2012. Dr. North diagnosed Hanson with "Paraphilia, Not Otherwise Specified (NOS) (coercive, females);" exhibitionism; cannabis dependence; social phobia; and antisocial personality disorder. The State identified Dr. North as an expert witness at trial.

Hanson identified licensed psychologist Dr. Robert Halon as an expert witness who would testify at trial. Dr. Halon evaluated Hanson in 2009 and again in 2013.

On the first day of the trial on March 11, 2013, the State moved to exclude expert opinion testimony from any defense witness other than Dr. Halon.[2]

Hanson's attorney told the court that "last week" during the deposition of a Special Commitment Center (SCC) residential counselor for the Washington State Department of Social and Health Services (DSHS), the attorney learned that the counselor, John Rockwell, had "an opinion about Mr. Hanson and his treatment that he received at [the Sex Offender Treatment Program] and the way he's internalized the treatment." Hanson's attorney asked the court to allow Rockwell to testify "as an expert in sex offender treatment" for the limited purpose of presenting his opinion that "Erik Hanson has benefited significantly from treatment."

The State argued that Hanson had not previously disclosed Rockwell as a potential expert but rather as a fact witness, that Rockwell had only limited contact with Hanson, and that Rockwell did not provide sex offender treatment to Hanson. Hanson's

_____

[2] Hanson waived his right to be present at trial.

2

attorney argued neither party had "followed any of the discovery guidelines in this case," and the State could have deposed Rockwell at any time. But Hanson's attorney told the court Rockwell's opinion might be unnecessary if Dr. North testifies that "Mr. Hanson internalized treatment and did very well with it, and still continues to live by the principles." The trial court reserved ruling "until after Dr. North testifies."

At trial, the State presented the testimony of the victim of the 1999 conviction for attempted rape in the second degree, Mary Beth Woll. Woll testified that in January 1999, she was working as a coordinator at a church. Woll said that Hanson was unemployed and homeless and asked her to help him. Woll made calls on Hanson's behalf to various community service providers, purchased groceries for him, and gave him cash for bus fare. Woll invited Hanson to come to her house and join her family for dinner.

After dinner, Woll drove Hanson back to the homeless shelter where he was staying. When Woll stopped to let him out, Hanson climbed out of the passenger seat and into the back seat of Woll's van to collect a bag of groceries. Hanson reached over the back seat and began to strangle Woll. Woll testified that as she struggled against "a strap of some kind" around her neck, she heard herself making "gurgling, unhuman sounds," and she thought she "was being strangled to death." Woll testified that it was "excruciatingly painful," and she eventually passed out. Woll said that when she woke up, she was lying face up on her back on the back seat with Hanson on top of her and his face very close to her. Hanson began to apologize. After Woll yelled at Hanson to get out, he left.

Woll testified that she had trouble swallowing, that she suffered bruising on her neck, and that she had broken blood vessels in her eyes, her neck, and all over her face that looked "bright red like a sun burn."

The State next introduced into evidence Hanson's videotaped deposition and documents detailing his prior criminal convictions. The State also introduced into evidence a videotaped deposition of former treatment provider Gaylen Gold.

Gold testified about the admissions Hanson made during treatment, such as he "planned and had sexual fantasies several days" prior to sexually assaulting his five-year-old cousin, "poked her with a pick-up stick to make her feel pain," and refused to stop when she asked. Hanson admitted that he "posted his sister as a look-out to prevent detection" while he assaulted his cousin. Hanson also admitted that he "anally raped his five-year-old brother . . . and sexually abused him every night for approximately two years."

Gold testified that Hanson told him that he "rubbed his penis against the buttocks and vaginas of his [two] eight-year-old cousins . . . when he was nine years old [and] had them perform oral sex on him." Hanson also admitted that he "physically abused his [two] sisters . . . to gain compliance for oral, anal, and vaginal sex . . . several times daily every other weekend when the girls visited their biological mother" over "a three-year period." Hanson said that he "sexually" fondled "various pets" and "killed a pet guinea pig by sticking a pencil in the animal's vagina."

Gold also testified that Hanson admitted that he "physically assaulted and planned to sexually assault a female teacher following two weeks of deviant fantasizing." Gold testified that Hanson also told him that he "planned to physically

assault an adult female janitor because she angered him" but "was discouraged from his plan for fear of possible intervention by a co-worker."

Dr. North diagnosed Hanson with paraphilia NOS, exhibitionism, and antisocial personality disorder. Dr. North testified about the diagnosis. Dr. North described the "most dangerous" "antisocial personalities" as "psychopaths." Dr. North defined a "psychopath" as "someone who lacks a conscience, . . . has sort of a 'me first' approach to the world," and "disregard[s] the feelings and the rights and welfare of other people." Outside the presence of the jury, Hanson's attorney objected to Dr. North's use of the term "psychopath" as unduly prejudicial and lacking a proper foundation. After a lengthy colloquy, the trial court overruled the objection.

When trial resumed, Dr. North described the "Hare Psychopathy Checklist Revised" as a psychological construct he uses to measure psychopathic characteristics and determine whether a person is properly deemed a psychopath for clinical purposes. According to Dr. North, a score between 25 and 30 is generally accepted in a clinical setting as indicating psychopathy. Hanson scored 27. Dr. North explained the score of 27. Dr. North described Hanson's psychopathic traits as well as the traits he viewed as inconsistent with psychopathy.

Dr. North testified that Hanson's paraphilia NOS and antisocial personality disorder are not curable. Dr. North stated that in his opinion, Hanson's mental abnormalities made it likely that he would engage in predatory acts of sexual violence if not confined in a secure facility and described the actuarial tools he used to assess Hanson's risk of reoffense.

5

On the next day of trial, the State asked Dr. North to give examples of the types of crimes he believed Hanson might commit in the future. Dr. North testified, "I think that he would be likely to commit a rape, an attempted rape, a sadistic sexual assault, or perhaps a sexually oriented murder." Hanson asked for a mistrial. Hanson objected to the reference to a "rape-murder" as inflammatory, not supported by the evidence, and not previously disclosed by Dr. North. Hanson also objected to the use of the word "sadistic" as inflammatory and not supported by the evidence, particularly in light of the fact that Dr. North did not diagnose sadism.

The trial court overruled the objection to "rape-murder," finding that "a reasonable person could interpret the actions that [Hanson] took towards Mary Beth Woll as a potential attempted murder." Because Dr. North testified as an expert, and because Hanson's attorney made no offer of proof that Dr. North was specifically asked to identify potential crimes in his deposition, the trial court allowed the challenged testimony. The court also overruled the objection to Dr. North's use of the word "sadistic," finding that Hanson had admitted to conduct with "some evidence to support sexual sadism," including "injury to animals for sexual gratification."

The court denied the motion for a mistrial. The court ruled that Dr. North's opinion was not "so unduly prejudicial that its probative value was substantially outweighed by the danger of unfair prejudice in this case." However, the court granted Hanson's request for a recess to review Dr. North's deposition and make an offer of proof. After additional and extensive argument by both sides, the trial court adhered to its previous ruling. The court also noted that "murder" is included in the list of crimes that could constitute a "sexually violent offense" under RCW 71.09.020(17).

Regarding sex offender treatment, Dr. North testified that Hanson "benefited from it in some ways" but not "in terms of reducing his risk for sexual reoffense." Dr. North stated that those who participate in treatment because it is required rather than by choice are unlikely to benefit from treatment. Dr. North testified that Hanson told him that he did not want treatment.

On March 19, the court considered Hanson's request to allow Rockwell to testify as an expert witness. Hanson's attorney acknowledged that the defense had not indicated before trial that it intended to qualify Rockwell as a sex offender treatment expert to testify about whether Hanson benefited from treatment. Hanson's attorney stated that until the defense deposition of Rockwell, the attorney "didn't understand" how often Rockwell met with Hanson and "didn't anticipate that Mr. Rockwell would have an opinion" about "some of [Hanson's] risk factors and how he's managing at the SCC, and how he's doing things differently" based on his internalization of treatment principles. Hanson's attorney also acknowledged that Rockwell testified in the deposition that he did not treat Hanson and had not reviewed Hanson's treatment records.

The attorney said the records were e-mailed to Rockwell "this morning." Hanson's attorney stated Rockwell would testify about "his observations as to whether or not he perceives Mr. Hanson to be glib or have superficial charm" and whether Hanson is "social" or tends "to isolate." Hanson's attorney clarified, "I wouldn't have Mr. Rockwell testify about" the psychopathy checklist, refer to the checklist, or "ask him if he ranked it or finds [Hanson] has psychopathy." Nonetheless, the attorney stated, "[T]he jury will hear about different factors that an expert looks at" on the psychopathy

checklist, "such as superficiality, glibness, [and] charm," to which Rockwell's "observations" of Hanson are "relevant."

The State argued there was no basis to qualify Rockwell as an expert, there was no reasonable excuse for the late notice, and the late notice prejudiced the State's case.

Following lengthy argument, the trial court ruled Rockwell could testify as a fact witness but not as an expert. The court ruled, in pertinent part:

> Given everything that has been expressed by both counsel, I think it is too late. Given that I think the State properly relied on the representation all the way up until Monday morning of trial that he wasn't going to be called as an expert, it's unfair play at this point under CR 26 (E)(4) to allow him to be an expert. I do think he can testify, however, as to his personal observations. Obviously, hearsay objections will be sustained. So in terms of his observations about Mr. Hanson's conduct, his behavior on the unit, whether he observed whether he's isolating himself or not, I think that's all perfectly acceptable testimony as long as he's got the foundation for it.
>
> . . . .
> . . . Certainly, I think there was a change of strategy on the part of the respondent's counsel late, which is understandable, but I think it's unduly prejudicial to the State, and is frankly a choice that was made too late . . . . In terms of a lesser sanction, there really isn't, other than continuing trial. At this point we're in the second week. There is no reasonable way to do that without severely prejudicing the State as well as inconveniencing the jury pool. We might lose some jurors if this continued too far out. We would have to have a mistrial and start over. And lastly, I think in the interest of justice we can limit -- he can still testify. We can limit the kinds of information he's going into as a fact witness.

Rockwell testified that Hanson was "[a]micable[,] a quiet person, polite, friendly, respectful." Rockwell said that he had not observed Hanson misbehaving or manipulating people and would not "describe him as superficially charming" because "his emotions appear to fit the content of what he's discussing." Rockwell also testified that he had not observed Hanson isolating himself and instead described Hanson as "[s]ociable to a limited degree" and becoming more social over the years.

8

Dr. Halon testified as an expert witness on behalf of Hanson. Dr. Halon testified that he reviewed numerous documents and met with Hanson twice in 2009 and 2013. Dr. Halon stated that in his opinion, Hanson does not suffer from a mental abnormality under the criteria of the sexually violent predator statute. Dr. Halon criticized the overuse of paraphilic coercive disorder or paraphilia NOS nonconsent as a diagnosis. Dr. Halon stated that in his opinion, the evidence did not support such a diagnosis in Hanson's case. According to Dr. Halon, "If you can't find evidence of the recurrent and intense sexually arousing fantasies, and sexual urges for the force -- not the sex that you get out of it -- but the force, you can't make the diagnosis of nonconsent." In his opinion, Hanson's description of his fantasies when considered with his past behaviors indicated that he experienced arousal "to the sex, not the force." Dr. Halon testified that Hanson's lack of sexually arousing fantasies of force "makes him a rapist instead of a mentally disordered offender."

Dr. Halon stated that he was aware that Dr. North used the psychopathy checklist in evaluating Hanson but testified that he did not use it because "it's immaterial." According to Dr. Halon, the results of the psychopathy checklist do not "add any information as to whether or not Mr. Hanson has . . . mental abnormality" and "doesn't say anything about volitional impairment or predisposition to commit sexually violent offenses." Dr. Halon stated the psychopathy checklist merely measures "how antisocial this person might be." Dr. Halon testified that use of the checklist is very subjective and unfair when applied to someone like Hanson who "has spent so much time in lockup and institutions" that "he hasn't had the chance to develop like a normal adult would."

Dr. Halon also described psychopathy as "a very adaptive . . . evolutionary" function rather than "a disorder or a pathology." According to Dr. Halon, unlike the average person, psychopaths "don't really care a lot about how other people feel, . . . are much more concerned with themselves," and are "not apt to put themselves out in danger for other people." But "there's nothing about psychopathy that says they have volitional impairment or that they are predisposed to committing sexually violent crimes."

Dr. Halon also testified that he did not diagnose Hanson with antisocial personality disorder because he found "no sign of a pervasive pattern of disregard for and breaking the rights of other people." Dr. Halon described most people with antisocial personality disorder as "liars, expedient," while Hanson appeared to be more honest. Dr. Halon also did not "know of any evidence that suggests that specifically antisocial personality disorder predisposes a person to commit sex crimes" or causes "serious difficulty in controlling . . . sexual violent behavior."

Dr. Halon testified that a person with a mental abnormality that drives him to act "out sexually in a certain way violently, predatorily," will "express signs and symptoms of sexual deviance" even when "locked up" or "confined to a room," hospital, or prison. Dr. Halon testified to the lack of such signs and symptoms during the past years of Hanson's confinement.

Dr. Halon also testified that he had reviewed Hanson's records from sex offender treatment and identified evidence indicating Hanson was using principles taught in sex offender treatment "every day." Finally, Dr. Halon reviewed the same actuarial tools used by Dr. North to assess Hanson's risk of reoffense and testified about his differing results.

The jury found the State proved beyond a reasonable doubt that Hanson is a sexually violent predator under chapter 71.09 RCW. The court entered an order of commitment to the custody of DSHS. Hanson appeals.

ANALYSIS

Motion for Mistrial

Hanson contends the trial court erred by denying his motion for a mistrial after Dr. North "made unsupported and extremely prejudicial statements describing Hanson as a psychopath and potential murderer." Hanson claims Dr. North "unexpectedly stated that Hanson exhibited signs of clinical psychopathy," and the references to sadistic rape and murder were "unfounded," inflammatory, and prejudicial.

A respondent in a civil commitment proceeding has a constitutional right to a fair trial. In re Detention of Ross, 114 Wn. App. 113, 121-22, 56 P.3d 602 (2002). A mistrial is warranted in civil commitment proceedings only if the respondent has been so prejudiced that nothing short of a new trial can ensure that the respondent receives a fair trial. In re Detention of Griffith, 136 Wn. App. 480, 485, 150 P.3d 577 (2006). We review the decision denying a motion for a mistrial for abuse of discretion. In re Detention of Broten, 130 Wn. App. 326, 336, 122 P.3d 942 (2005).

Hanson does not accurately characterize the testimony, evidence, and argument actually considered by the trial court in deciding the motion for a mistrial.

Contrary to the characterization in the brief on appeal, Hanson's attorney did not object to Dr. North's testimony about psychopathy as unexpected. And nothing in the record suggests that Dr. North's testimony about psychopathy was a surprise.

11

Dr. Halon testified that he was aware of Dr. North's use of the psychopathy checklist based on his review of Dr. North's reports. Moreover, nothing in the record indicates that Hanson's motion for a mistrial was based on Dr. North's use of the term "psychopath." Instead, the record indicates Hanson's attorney argued surprise to only Dr. North's testimony regarding Hanson's potential to commit a sexually motivated murder.

On appeal, Hanson does not provide argument or authority to establish that admission of such testimony in these circumstances constituted a trial irregularity justifying a mistrial. Further, while Hanson acknowledges that his attorney read portions of Dr. North's deposition into the record as an offer of proof, Dr. North's deposition is not in the record before this court and Hanson does not identify any error in the court's determination that the attorney failed to establish surprise. We will not consider arguments not supported by reference to the record and citation to authority. RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 819, 828 P.2d 549 (1992).

Hanson also claims Dr. North's testimony that Hanson may commit a sadistic rape or sexually motivated murder justified a mistrial because it is without a factual foundation. In particular, Hanson argues that because he had never committed a murder or rape, and because Dr. North had previously testified that he did not diagnose sadism, Dr. North's opinion of Hanson's potential for committing a sadistic rape or sexually motivated murder was inadmissible.

But Hanson fails to explain how admission of this evidence constitutes grounds for a mistrial. Nonetheless, Hanson's argument ignores the court's ruling that his attack

on Woll and his admissions to acts involving sexual sadism created a sufficient factual foundation for Dr. North's opinion. The record supports the trial court's ruling.

Woll testified that she thought she was going to die and described what she believed to be her "spirit" leaving her body and then returning. Hanson admitted in his deposition that he had fantasies about raping Woll throughout the entire time he spent with her and that when he realized later that he could have killed her, he was "scared . . . , like it could have happened." The jury also heard Gold's testimony describing Hanson's admissions to wanting to make his cousin "feel pain" while he was sexually assaulting her, to physically abusing his brother and sisters "to gain compliance" during his sexual assaults against them, and to "sexually fondling" and killing the pet guinea pig. Hanson does not establish the court abused its discretion in finding Dr. North's opinion was supported by sufficient facts in the record.

Hanson also fails to demonstrate that Dr. North's reference to sadistic rape and sexually motivated murder was so inflammatory that the court abused its discretion by denying his motion for a mistrial. "Testimony regarding the future dangerousness of [sexually violent predators], by its nature, is prejudicial," but the "probative value of this testimony is high and directly relevant to whether an individual should be committed as a sexually violent predator." In re Detention of Thorell, 149 Wn.2d 724, 758, 72 P.3d 708 (2003). The trial judge is in the best position to determine prejudice and, here, determined the probative value of Dr. North's testimony outweighed the danger of unfair prejudice. State v. Smith, 124 Wn. App. 417, 428, 102 P.3d 158 (2004).

On this record, the court did not abuse its discretion in denying Hanson's motion for a mistrial.

Expert Testimony

Hanson next contends the trial court violated his due process right to present a defense by refusing to allow Rockwell to testify as an expert.[3] Without citation to the record, Hanson asserts he "needed Rockwell's professional opinion and evaluation of Hanson's behavior" after "Dr. North changed his expert opinion on the stand and suddenly testified that Hanson was a psychopath." This assertion is a mischaracterization of the record. Our review of the record shows that prior to trial, Hanson's attorney and his expert, Dr. Halon, were aware of Dr. North's use of the psychopathy checklist as well as the score he computed for Hanson. Nothing suggests Dr. North "changed his expert opinion" regarding psychopathy or Hanson's score while "on the stand." Similarly, the record establishes that Hanson's attorney did not seek to qualify Rockwell as an expert in assessing psychopathy according to the checklist but, instead, planned to ask Rockwell about his observations of the kinds of behavior described in the psychopathy checklist without actually referring to the list by name.

Further, the record shows Dr. Halon addressed the diagnosis of Dr. North, including the checklist. Dr. Halon reviewed and disagreed with Dr. North's diagnoses, psychopathy assessment, and conclusions. Dr. Halon presented extensive and detailed testimony addressing use of the psychopathy checklist and Dr. North's diagnosis. Dr. Halon also testified about his evaluation and opinions of the psychological components of Hanson's mental health and history and Hanson's apparent daily use of sex offender

---

[3] Hanson does not challenge the court's decision to exclude the testimony on other grounds. See, e.g., Jones v. City of Seattle, 179 Wn.2d 322, 343, 314 P.3d 380 (2013) (late-disclosed testimony will be admitted absent a willful violation, substantial prejudice to the nonviolating party, and the insufficiency of sanctions less drastic than exclusion).

treatment principles while in confinement at SCC. On this record, Hanson fails to identify or demonstrate error in the trial court's ruling concerning Rockwell's testimony.

Frye Hearing

Hanson contends the trial court erred by denying his motion for a Frye hearing to determine the admissibility of Dr. North's diagnosis of paraphilia NOS (coercion). Citing In re Personal Restraint of Young, 122 Wn.2d 1, 857 P.2d 989 (1993), and In re Detention of Berry, 160 Wn. App. 374, 248 P.3d 592 (2011), review denied, 172 Wn.2d 1005, 257 P.3d 665 (2011), the trial court denied the motion for a Frye hearing.

In Berry, we held that the proper focus of Frye "is the science upon which the expert's opinion is founded," and there was no question that "the science at issue is standard psychological analysis." Berry, 160 Wn. App. at 379. Although the defendant had "identifie[d] scientific criticism of the criteria and reliability" of the paraphilia diagnosis, he did not establish that it was no longer generally accepted. Berry, 160 Wn. App. at 380. We concluded that challenges to the reliability of a diagnosis of paraphilia NOS nonconsent went "to the weight of the evidence, not its admissibility." Berry, 160 Wn. App. at 382.

We adhere to our decision in Berry and conclude the trial court did not err in denying the motion for a Frye hearing. Here, as in Berry, Hanson had the opportunity to cross-examine the State's expert witness and to present his own expert, Dr. Halon, to testify to the shortcomings of the diagnosis. Accordingly, "[t]here was no evidentiary error and no violation of due process." Berry, 160 Wn. App. at 382.

Voir Dire

Hanson contends the trial court improperly limited the scope of voir dire. Specifically, Hanson challenges the court's ruling that his attorney could not ask jurors to place themselves in Hanson's position.

On March 12, the trial court reviewed a list of potential jurors. A number of jurors asked to be questioned outside the presence of the other jurors, including juror 2. After the State questioned juror 2, Hanson's attorney asked a number of questions, including "whether or not, if you were in [Hanson's] position, you would want somebody like you on the jury, not because you are going to release or commit him, because you can be fair." After asking several other questions, at the request of Hanson's attorney, the court excused juror 2 for cause.

After the court excused juror 2, the State asked the court to prohibit Hanson's attorney from asking "jurors to put themselves in the shoes of this party or the other party." After lengthy argument, the trial court ruled, in pertinent part:

> I'm going to instruct counsel not to ask the jurors to put themselves in the defendant's shoes. However, you can ask about bias. You can ask, you know, whether they can be fair and impartial. You can say that your client's liberty is . . . at risk and can they judge them fairly. There's a lot of ways to get at the kind of bias you are wanting to expose. I think it's fair to do that, but I think that that particular question is a hot button, and I'm going to instruct you to avoid it.

A trial judge has considerable discretion in shaping the limits and extent of voir dire. Lopez-Stayer v. Pitts, 122 Wn. App. 45, 50, 93 P.3d 904 (2004). "The ultimate test here is not whether the trial judge should or should not have allowed any single question or even line of questioning. The test is whether the court permitted the [litigant] to ferret out bias and partiality." Pitts, 122 Wn. App. at 51. "Absent an abuse of

16

discretion and a showing that the accused's rights have been substantially prejudiced thereby, the trial judge's ruling as to the scope and content of voir dire will not be disturbed on appeal." State v. Frederiksen, 40 Wn. App. 749, 752-53, 700 P.2d 369 (1985); accord, State v. Yates, 161 Wn.2d 714, 747-49, 168 P.3d 359 (2007) (where trial court gave ample latitude to explore prospective jurors' religious beliefs relating to death penalty, defendant could not show substantial prejudice resulting from court's tentative rejection of certain proposed questions). On this record, Hanson fails to establish any abuse of discretion or any resulting prejudice in the trial court's ruling limiting voir dire.

We affirm the civil commitment as a sexually violent predator under chapter 71.09 RCW.

WE CONCUR:

Trickey, J

Cox, J.

17